## MASON v. MacFADDEN.

(Circuit Court of Appeals, Eighth Circuit. April 7, 1924.)

No. 6420.

**1. Trusts ⬤⟹365(3)—Laches may be imputed to beneficiary after trust has been repudiated.**

Laches may be imputed to the beneficiary of a trust because of delay in bringing suit for its enforcement after it has been expressly repudiated by the trustee.

**2. Trusts ⬤⟹365(2)—Complaint to enforce held barred by laches.**

Complainant acquired by assignment a minor interest in an oil and gas lease, title to which was held in trust by defendant. On application for assignment of his interest defendant refused, and denied that complainant had any interest. The lease at that time was of only speculative value. Complainant brought suit in a state court to recover his interest, but the suit was not prosecuted, and was still pending when, ten years later, he brought the present suit in the federal court. In the meantime defendant and the other owners had kept the lease alive by payments, had obtained a renewal in their own names, and by recent development, to which complainant contributed nothing, had made the property of large value. *Held*, that complainant was barred by laches from enforcement of the trust in his favor.

**3. Equity ⬤⟹87(1)—Laches not necessarily determined by statute of limitations.**

The doctrine of laches, as applied in federal courts of equity, does not always follow the state statutes of limitation, but is governed by equitable considerations peculiar to each case.

**4. Equity ⬤⟹72(4)—Doctrine of laches applied rigorously in suits involving oil property.**

The doctrine of laches will be rigorously applied in suits involving property of speculative value, such as mining and particularly oil properties.

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Equity ⊙⟶71(1)—Filing suit, which is not prosecuted, does not relieve party from defense of laches.**

  A party, by merely filing suit, which he fails to prosecute for an unreasonable time, does not relieve himself from the application of the doctrine of laches.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Suit in equity by C. K. MacFadden against D. B. Mason and others. Decree for complainant, and defendant Mason appeals. Reversed.

William F. Tucker, of Tulsa, Okl. (Hulette F. Aby, of Tulsa, Okl., on the brief), for appellant.

William L. Moore and Horace G. McKeever, both of Enid, Okl., for appellee.

Before STONE and KENYON, Circuit Judges, and PHILLIPS, District Judge.

KENYON, Circuit Judge. The parties will be designated as in the trial court, appellee here being plaintiff there, and D. B. Mason, appellant, being the only defendant against whom the case was not dismissed.

Plaintiff, C. K. MacFadden, brought action in the District Court of the United States, claiming that in 1904 defendant secured for the benefit of himself, George Church, and Louis B. Elyea first an option for a sublease, and later the sublease, for oil and gas purposes on certain land in the Osage Nation, Okl., now Osage county, Okl., paying therefor the sum of $1,860. The said lease at the time was the property of the Indian Territory Illuminating Oil Company, a corporation, and extended until March 16, 1916. Plaintiff claimed that the said defendant Mason and George Church and Louis B. Elyea each had a one-third interest in this sublease, and that the title was held by the defendant in trust for them, by virtue of an oral agreement; that later Elyea sold an undivided one-ninth interest in the said leasehold estate to E. B. and W. N. Carter, and afterwards assigned another one of his one-ninth interests to Charles Rittersbacher; that defendant, holding these in trust, made the assignments for the benefit of Louis B. Elyea to the said Charles Rittersbacher, and that the assignment of Elyea was made to him in trust for the American Well & Prospecting Company, to be held as part consideration for drilling a well on the premises; that on May 8, 1907, Elyea sold, transferred and assigned to the plaintiff his claimed undivided one-ninth interest; and it is plaintiff's claim that he is the owner thereof, and that the legal title is in defendant in trust for the equitable owners. Plaintiff also claimed that on March 4, 1916, defendant Mason, E. B. Carter, W. N. Carter, F. M. Overless, and George W. Church, cotenants in common with plaintiff, procured from A-she-gah-he, principal chief of the Osage Indians, another oil and gas lease covering the same premises as in the lease of the Indian Territory Illuminating Oil Company, which lease was duly recorded in the lease records of Osage county, Okl.

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Plaintiff further claimed that on or about the 16th day of February, 1911, he made demand upon defendant for an assignment to him of his claimed undivided interest, that defendant refused to recognize such interest, and that plaintiff brought suit in the district court of Osage county, Okl., claiming substantially as here, viz. that he was the owner of an undivided one-ninth interest in and to the oil and gas rights covered by the leasehold, and asking the court to affirm and establish his right. This suit was never tried.

The defendant's side of the controversy is that he separately and alone on the 19th day of May, 1904, obtained from the Indian Territory Illuminating Oil Company an option agreement to purchase a sublease for oil and gas purposes on certain land in Osage county, Okl., for the sum of $1,860; that he paid $186 at the time of taking the option, under an agreement to commence one well for oil and gas purposes within 30 days, and to commence a second well within 30 days from the completion of the first one, and to pay the balance of the $1,860 in cash upon delivery of the sublease; that in July, 1904, he paid $186 additional to extend his option on the sublease until the 19th day of August, 1904, and that at about said date he paid the remaining part of the purchase price to the Indian Territory Illuminating Company, and obtained the sublease for oil and gas purposes; that said sublease was approved by the Secretary of the Interior on June 26, 1907; that he sold to Elyea a one-ninth interest in said leasehold on the same basis and for the same price which he had paid, and that Elyea paid $20 thereon, no instrument of conveyance being given, and the entire transaction being oral; that he advised Elyea as to the terms of the option, and that it was necessary to drill the two wells in addition to paying the purchase price agreed; that he made demand on Elyea for his part of the balance due on the purchase price of the sublease, but that Elyea refused to pay the same, and that Elyea later advised defendant that he could not pay the balance due for the one-ninth interest, and that he had disposed of said interest to one Rittersbacher, and that he must look to Rittersbacher for payment thereof; that defendant did thereafter, with the knowledge and consent of Elyea, assign in writing to the said Rittersbacher the one-ninth interest that had been contracted for by Elyea, and that the assignment to Rittersbacher was approved by the Secretary of the Interior; that Elyea never had more than a one-ninth interest, and, having assigned the same to Rittersbacher, he had no interest whatever at the time of the alleged assignment to plaintiff herein on the 8th day of May, 1907.

Defendant claimed that plaintiff had nothing to do with the transaction in which A-she-gah-he, principal chief of the Osage Indians, executed another gas lease on behalf of the tribe, covering the same lands, which was duly approved by the Interior Department of the United States of America; that the same was acquired by defendant Mason, E. B. Carter, W. N. Carter, F. M. Overless, L. Caton, and Geo. W. Church; that on February 11, 1907, he assigned to Geo. W. Church, L. Caton, E. B. Carter, and W. N. Carter each an undivided one-ninth interest, and to Charles Rittersbacher an undivided two-ninths interest, in and to said leasehold, and that said assignments were duly approved

by the Secretary of the Interior on June 26, 1907, and filed in the Osage Indian Agency, and gave notice of the claimed ownership; that the sublease expired on March 16, 1916, and that defendant and his co-owners took a new lease, with no mention of plaintiff therein; that plaintiff took no part in securing the same, nor protested against defendant and his co-owners taking said lease.

Defendant also claims laches on the part of plaintiff, in that during the time he was attempting to improve and develop the property, drill wells thereon, and bearing the expense incident thereto, the said Elyea and plaintiff contributed nothing, and made no offer to contribute, nor asserted any claim to ownership; that the leases, papers, assignments, and other documents were on file and constituted part of the records of the Superintendent of the Osage Tribe of Indians at Pawhuska, Okl.; that they were open for inspection, and that they showed that the sublease from the Indian Territory Illuminating Oil Company to defendant was approved June 26, 1907, and that the assignment from defendant to Church, Caton, the Carter brothers, and Rittersbacher, covering the two-thirds interest in said sublease, was recorded in said Osage Indian Agency ever since June 26, 1907, and was full notice to plaintiff and his assignor, Elyea, of the facts therein stated and of the claimed ownership; that defendant made sales of certain parts of the property—one in particular, known as the Curl sale—and disbursed the funds therefrom to the parties who claimed to be the owners, but that neither plaintiff nor his assignor were included in said distribution, the disbursements being to Rittersbacher, Church, Caton, the Carter brothers, and himself; that in 1912 defendant and his cotenants drilled a well on the land at a cost of $6,400; that plaintiff contributed nothing thereto; that one sale of interest in the leased lands was made to John Markham for $10,000 and the amount received was distributed by defendant to his cotenants through the bank, but no accounting was made to plaintiff for any alleged interest; that plaintiff, after the Markham sale, commenced suit in 1911 in the district court of Osage county, Okl., against defendant Mason and others as defendants, in which he made claim for an undivided one-ninth interest and asked for an accounting, the allegations of that action being practically the same as these, but the same was never pressed for trial; that through the 17 years that defendant held the legal title for himself and in trust for others plaintiff and his assignor did nothing to assist in the development of the property; that in 1916 the lease was approved for another period of 10 years; that plaintiff had nothing to do with securing the renewal; that the property has been developed at an expense of from $150,000 to $175,000 defendants being furnished assistance from the Globe Oil Company, and that no money or counsel have been contributed to the enterprise by plaintiff whatever since 1911, nor have any demands or claims to ownership outside of the suit in Osage county, Okl., been made; that Rittersbacher, who would be an important witness, is now dead.

This covers in general the claims of the respective parties. The court found that plaintiff was the owner of an undivided one-ninth interest in the oil and gas mining leasehold covering the land before mentioned

and described as follows, to wit: The fractional southeast quarter (S. E. ¼) of section twenty-three (23), township twenty-one (21) north, range eight (8), and the west·half (W. ½) of the northeast quarter (N. E. ¼) of section twenty-three (23), township twenty-one (21) north, range eight (8) east, Osage county, Okl., and also such portion of the fractional portions of sections four (4), ten (10), fifteen (15), twenty-two (22), and twenty-three (23), township twenty-one (21) north, range eight (8) east, Osage Indian Reservation, now Osage county, Okl.—and that defendant held the legal title of said one-ninth interest in trust for plaintiff; also ordered an accounting for income, rents, and profits derived by defendant from said leasehold interest.

The claims of plaintiff and defendant as to the leasehold are in sharp conflict. Defendant admits that Elyea contracted for a one-ninth interest, while Elyea contends his arrangement was for a three-ninths interest. If Elyea had but a one-ninth interest, it passed out on the assignment to Rittersbacher, and plaintiff would have secured nothing by the assignment to him from Elyea. Defendant testifies that Elyea told him he had sold all his interest to Rittersbacher. Elyea testifies that he told him he had sold a one-ninth interest to Rittersbacher. Elyea apparently always claimed more than a one-ninth interest. The checks in evidence show that Elyea did pay a part of the amount necessary to secure the option and also to secure the sublease.

We accept the theory, for the purpose of this opinion, most favorable to the plaintiff, viz. that Elyea had not assigned all of his interest to the Carter brothers and Rittersbacher, but that he did have a one-ninth interest at the time of the assignment to plaintiff, and that defendant held the one-ninth interest in trust for him. We deem the question of the amount of Elyea's interest unimportant, in view of our conclusion in the case as to the application of the doctrine of laches. It is quite apparent that as early as February, 1911, the defendant refused to recognize any right of plaintiff in the property, and, if any trust ever existed, it was then repudiated. Mason testified that he thought MacFadden came to him and demanded his interest, and that he told him that he had no interest. This was about the time the plaintiff filed suit in the state court, and since that time defendant testifies he had never heard a word from MacFadden or Elyea concerning the matter; that he had never inquired about it—never demanded any settlement or statement of the affairs of the company, either through himself or any agent or attorney. This is in no wise denied in the record. We think the pleadings of the plaintiff in the case in the state court also sustain the theory of repudiation of the trust by defendant and the knowledge of such position on part of plaintiff. Said petition has in it the following allegation:

"That on or about August 19, 1904, and September 27, 1905, said D. B. Mason, without the knowledge or consent of the said Louis B. Elyea, assigned to J. J. Curl all the right, title, and interest conveyed by the assignment from the Indian Territory Illuminating Oil Company to the said D. B. Mason, in so far as the same covered the following described lands, to wit: So much of the following named sections lying east of the Arkansas river, to wit: The south half of section 10, the south half of section 15, and the west half of section 23, in township 21 north, range 8 east. That the said D. B. Mason has refused to account to said Louis B. Elyea or the plaintiff herein for the

total of the consideration received for said assignments to J. J. Curl the amount of which consideration the plaintiff is unable to state, and has denied the right and title of the said Louis B. Elyea and of the plaintiff herein in said assignment from the Indian Territory Illuminating Oil Company, and the leasehold estate covered by it, and does now deny that the plaintiff has any right, title, or interest in the premises or in the money received from said assignments to J. J. Curl."

Also in the reply in this case is the following:

"This plaintiff admits that he has never communicated with the defendant since 1911 with reference to his property rights in and to said leasehold, for the reason that the said defendant in said year, to wit, in the month of March, 1911, refused to recognize this plaintiff as his cotenant in common or as interested in said leasehold rights, and advised the plaintiff that he would not recognize him and by reason of which the plaintiff filed the suit aforesaid in the district court of Osage county, Okl."

[1] From the entire record it is quite apparent that if any trust ever existed it was renounced, openly disavowed, and an adverse interest claimed by the defendant, and was so understood by the plaintiff, at least as early as February or March, 1911. The doctrine of laches would not apply as long as the trust relationship existed, but where there is a repudiation of the trust the door to the defense of laches opens. Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Riddle v. Whitchill, 135 U. S. 621, 10 Sup. Ct. 924, 34 L. Ed. 283; Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214.

[2] From the time of the repudiation of the trust in March or February, 1911, it was more than 10 years until this suit was filed. Are the circumstances sufficient to sustain the claim of laches? From 1911 to the time of the commencement of this suit it is apparent from the record that the subleases were not regarded as of much value; that defendant attempted to get rid of the same, putting them in the hands of brokers in Tulsa to sell for either $2,000 or $2,500, but that they would not bring that figure; that the property had no particular value, and he was keeping the leases alive; that he paid bond premiums and was reimbursed by his cotenants, but nothing was ever paid on the premiums by Elyea, except one check of $20.

In 1911 there was some oil excitement, and oil was discovered near the lands covered by the sublease. Defendant then sold 400 acres of the leasehold right to one Markham for $10,000 cash, which was distributed to his co-owners through the bank, but no accounting was made to the plaintiff for any alleged interest. Up to this time about all the tangible assets of the leasehold were two dry holes, drilled in 1905 and 1906. Before suit was brought in the state court in 1911, plaintiff and Elyea had done very little to in any way assert any claim of ownership. Of course, under the theory that defendant held a one-ninth interest in trust for plaintiff there was no necessity of exercising any act of ownership, but when the trust was renounced and repudiated and adverse interest claimed by defendant, as the record shows, plaintiff could not remain quiet and make no assertion of right in view of changing conditions, and especially in view of the fact that this was mining and oil property. From February or March, 1911, when the trust was repudiated, up to the time of bringing this action, plaintiff did absolutely nothing to assert any right on his part to an interest

in the leasehold except the filing of the suit in Osage county, Okl. Conditions were changing. A new lease was to be secured in 1916. Plaintiff took no part in this. The sublease was secured by defendant and his co-owners of record from the Osage Tribe of Indians. None of the expenses incident to this were paid by plaintiff; neither have any of the rentals nor other charges. Defendant made arrangements with the Globe Oil Company to give them a certain interest if they would drill for oil and gas, and this was done, and oil was discovered after an investment of from $150,000 to $175,000, and the enterprise, according to the record, now represented a worth of approximately $250,000; and outside of the small amounts contributed originally by Elyca, neither he nor plaintiff has contributed in any degree to the enterprise.

Plaintiff has done nothing to carry on the action filed by him in March, 1911, in the district court of Osage county, because he has spent so much of his time with other oil interests in Europe, South America, and the West Indies, and on boats between South America, San Domingo, and the United States, that no time was found to come to Oklahoma and take up the matter. He has spent the last 10 years in Paris and apparently this claim was so inconsequential that he passed it by. An interesting sidelight on the situation is shown by a statement of the reply, referring to failure to prosecute the case in the state court, as follows:

"But the same has been permitted to lie dormant for the reason that this plaintiff has since said time been a resident of the state of New York, and has spent much of his time with other oil interests in Europe, South America, and the West Indies, and that no time has been convenient for him to come to Oklahoma to have his attorney take such matter up, unless it became absolutely necessary."

[3] It is argued by plaintiff that his interest was an interest in real estate, and that the Oklahoma statute of limitations with reference to actions affecting an interest in real estate is 15 years. The statute of limitations of the state is not controlling as to equity cases in the federal court, and the rule is laid down by this court in Wilson v. Plutus Mining Co., et al., 174 Fed. 317, 320, 98 C. C. A. 189, 192, as follows:

"Under ordinary circumstances a suit in equity will not be stayed before, and will be stayed after, the time fixed by the analogous limitation at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute but will determine the extraordinary case in accordance with the equities which condition it. When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches, and, when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case."

[4] In Childs v. Missouri, K. & T. Ry. Co., 221 Fed. 219, 222, 136 C. C. A. 629, 632, this court said:

"And when the property involved is of a speculative nature, such as mining property usually is, a court of equity will refuse to grant relief, even when the suit is instituted before the bar of the statute of limitation had attached."

Statutes of limitation apply to law actions, and are arbitrary in their operation. The doctrine of laches is not arbitrary, is a defense in equity, and founded on abstract justice. The applicability of the doctrine depends upon the circumstances of each particular case. Laches has frequently been applied to a period much shorter than the state statute of limitations, when conditions have changed to the injury of a party, and the enforcement of an alleged claim would work an injustice. In Jackson v. Jackson et al., 175 Fed. 710, 99 C. C. A. 286, a delay of three years in asserting an interest in oil lands was held laches. In Société Fonciere v. Milliken, 135 U. S. 304, 10 Sup. Ct. 823, 34 L. Ed. 208, a delay of two years under circumstances there shown in commencing proceedings to set aside a judgment for usury was held to constitute laches. So laches has been applied in equity suits regardless of statutes of limitation of the states where the circumstances warranted it in delays of two years and upwards. In equity the question of unreasonable delay within the period of the statute of limitations may prevent establishment of a claim. Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214; Abraham v. Ordway, 158 U. S. 416, 15 Sup. Ct. 894, 39 L. Ed. 1036; Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Brown v. County of Buena Vista, 95 U. S. 157, 24 L. Ed. 422; Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855; Buchler v. Black et al., 226 Fed. 703, 141 C. C. A. 459; Taylor v. Salt Creek Consol. Oil Co. et al. (C. C. A.) 285 Fed. 532.

This court is committed to the doctrine that mere lapse of time does not in itself constitute laches, but the court must find in addition that it would be inequitable to grant the relief. Minnesota Mut. Inv. Co. v. McGirr et al. (C. C. A.) 263 Fed. 847. In Drees v. Waldron, 212 Fed. 93, 95, 128 C. C. A. 609, 611, this court said:

"The doctrine of laches protects against a proceeding instituted or prosecuted without diligence, and where the delay and thus the fault of one party results in an unfair advantage over his adversary. The existence of laches is primarily determined, not by lapse of time, but by considerations of justice."

The test is not time, but whether the situation of the parties is so changed as to render prosecution of a suit inequitable, and this test has been adopted by the courts in the majority of cases dealing with the subject. See Pond Creek Coal Co. v. Hatfield et al., 239 Fed. 622, 152 C. C. A. 456; Kentucky Block Cannel Coal Co. et al. v. Sewell et al., 249 Fed. 840, 162 C. C. A. 74, 1 A. L. R. 556; Minn. Mt. Inv. Co. v. McGirr et al. (C. C. A.) 263 Fed. 847.

The doctrine of laches is especially applicable to mining and oil properties, and as to such the courts hold the parties to a rigorous rule, because of the fluctuating character of the property—the same being worth little or nothing to-day and thousands to-morrow. Parties cannot wait and speculate on the increased value, and be unwilling to bear their part of the burden that produces the same. Speaking of mining property, in Patterson v. Hewitt, 195 U. S. 309, 321, 25 Sup. Ct. 35, 38 (49 L. Ed. 214) the court says:

"Persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

The court there held that a delay of eight years in attempting to enforce a mining claim was inexcusable even though the statute of limitations was ten years. See, also, Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855; Johnston v. Standard Mining Co., 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; Reed v. Munn et al., 148 Fed. 737, 80 C. C. A. 215; Childs v. Missouri, K. & T. Ry. Co., 221 Fed. 219, 136 C. C. A. 629; Buchler v. Black et al., 226 Fed. 703, 141 C. C. A. 459; Stevens et al. v. McChrystal et al., 150 Fed. 85, 80 C. C. A. 39; Brissell v. Knapp (C. C.) 155 Fed. 809; Sturm et al. v. Wiess et al. (C. C. A.) 273 Fed. 457.

Were there nothing offered by way of explanation of plaintiff's delay to assert his claim, in view of the death of witnesses, of the change of condition of and the nature of the property, a court would have no difficulty in reaching a conclusion here that plaintiff was barred by laches from proceeding with his case.

[5] Does the fact that a suit was brought in 1911, asking the establishment of the alleged one-ninth interest, relieve plaintiff from the charge of laches? Defendant filed a demurrer in said case, and nothing further was done. A party, by merely filing suit and failing to prosecute the same for an unreasonable time, does not excuse himself from the effect of the doctrine of laches. It has frequently been held by the courts that, if a party fail in the diligent prosecution of action brought, the consequences, as far as laches is concerned, are the same as if the suit had never been brought. Johnston v. Standard Mining Co., 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; Willard v. Wood, 164 U. S. 502, 17 Sup. Ct. 176, 41 L. Ed. 531; Northrup v. Browne, 204 Fed. 224; Mackall v. Casilear, 137 U. S. 556, 11 Sup. Ct. 178, 34 L. Ed. 776.

The bringing of the suit in the state court in 1911 and the failure to prosecute it for 10 years does not excuse the palpable laches appearing in this record. This case seems to be one where a party invests a small sum of money in an enterprise, pays little attention to it thereafter, transfers his interest to another without being able to show what the consideration for the transfer really was, the other party so receiving the assignment of interest paying absolutely no attention to the development of the enterprise, engrossed in other business perhaps more likely to bring returns, then when by the enterprise and work of others the project becomes successful, after a 10-year wait, witnesses having died during that period and conditions having changed, comes into court and asks the enforcement of his alleged claim. He has slept long upon his rights. It is apparently an attempt to speculate upon and profit from the labor of others. The salutary doctrine of laches applies with full force to this situation. It is inequitable to grant the relief prayed.

The case is reversed, with directions to dismiss the complaint, at plaintiff's costs.